**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

Nos. 23-1550 & 23-1684
_____

STEVEN A. CONNER, DPM, P.C., Individually and on behalf of all others
Similarly situated,

Appellant in No. 23-1550

v.

FOX REHABILITATION SERVICES, P.C.,

Appellant in No. 23-1684

UNITED STATES OF AMERICA,

Intervenor

_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:21-cv-01580)
District Judge:  Honorable Michael M. Baylson
_____

Submitted under Third Circuit L.A.R. 34.1(a)
on May 9, 2024

Before: MATEY, MONTGOMERY-REEVES and ROTH, <u>Circuit Judges</u>

(Opinion filed: January 24, 2025)

―――――――――

OPINION[*]

―――――――――

ROTH, <u>Circuit Judge</u>

This case comes to us on cross-appeals by the plaintiff, Steven A. Conner, DPM, P.C.,[1] and the defendant, Fox Rehabilitation Services, P.C., in an action brought under § 227(b)(1)(C) of the Telephone Consumer Protection Act (TCPA).[2] Conner, who initially filed a class-action lawsuit, appeals the denial of class certification. Fox appeals the final post-trial judgment entered against it on Conner's individual TCPA claims, arguing that its faxes were not "unsolicited advertisements" and raising facial and as-applied constitutional challenges to § 227(b)(1)(C) on First Amendment grounds. The United States, after untimely notice, has intervened on appeal to defend the statute's constitutionality.[3] For the reasons explained below, we will affirm the District Court's orders denying class certification and entering judgment against Fox.

**I.**

Fox is a private healthcare provider that offers various physical, occupational, and

―――――――――――――――

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] For ease of reference, the Court will use "Conner" to refer to both the medical practice and the doctor who runs that practice.

[2] 47 U.S.C. § 227(b)(1)(C).

[3] The United States received notice only after Fox filed its reply brief on its cross-appeal, even though federal law required Fox to "give written notice to the circuit clerk immediately upon filing of the record or as soon as the [constitutional] question is raised in the court of appeals." Fed. R. App. P. 44(a). Fox did not file the required Rule 44(a) notice because, in its view, we did not need to reach the First Amendment issue.

speech therapy services to patients in their homes. It primarily receives patients through referrals from other medical providers, and it commonly uses faxes to communicate with referral sources. Shortly after the COVID-19 pandemic reached the United States, some of these referral sources contacted Fox and "ask[ed] for information related to Fox's position given the pandemic."[4] In response, Fox devised its first ever "'blast fax' campaign," in consultation with an internal "COVID task force," to create faxes for Fox's referral sources.[5] The purpose behind these faxes was "[t]o reassure [Fox's] partners and providers that Fox was open for business [during the pandemic] and [that] its services could be counted on."[6] Fox also wanted its referral sources to know it "was adhering to the COVID guidelines for healthcare that were being promulgated at the time."[7] It relied on a third party (OpenFax) to send the faxes to more than 20,000 fax numbers, which had been extracted from Fox's electronic records database (Raintree).

One of these fax numbers belonged to Conner, a private podiatrist who used his fax machine primarily to receive incoming lab results for his patients. Upon receiving a fax, Conner's machine would automatically print it unless the machine was out of paper. Over the span of nearly three months, Fox sent eight separate blast faxes to Conner (and a total 144,868 faxes to 20,609 fax numbers).[8] Before receiving Fox's faxes, Conner never had "any contact whatsoever with anyone from Fox Rehab and had never referred a

---

[4] *Steven A. Conner DPM, P.C. v. Fox Rehab. Servs., P.C. (Conner II)*, No. 2:21-cv-1580, 2023 WL 2226781, at *2 (E.D. Pa. Feb. 24, 2023).
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] The District Court appended copies of all eight faxes to its opinion. *Id.* at *9 (App. A).

patient to Fox."[9]  The unsolicited faxes created a problem for Conner "because reviewing and sorting them took time away from reviewing pertinent, patient-related faxes."[10]

## II.

Conner filed a class-action lawsuit against Fox for violating § 227(b)(1)(C).  After nearly one year of precertification discovery, Conner moved to certify the following class under Federal Rule of Civil Procedure 23(b)(3):

> All persons and business entities sent one or more facsimiles on (1) March 27, 2020, (2) April 2, 2020, (3) April 16, 2020, (4) April 21, 2020, (5) May 14, 2020, (6) May 19, 2020, (7) June 3, 2020, or (8) June 16, 2020, identified as "successful" transmissions on the fax transmission detail reports from OpenFax, and stating [Fox] was "HELPING FLATTEN THE CURVE WITH HOUSE CALLS" through its trademarked "Geriatric House Calls" therapy model.[11]

Fox opposed class certification and presented declarations from thirty-two putative class members who claimed they had voluntarily provided their fax numbers to Fox at some unspecified point during their business relationship.  All but one of them expressly stated that they did not consider the faxes to be advertisements, but that if the faxes were advertisements, Fox had their permission to send them advertisements.  The District Court denied Conner's motion to certify the class because he had failed to satisfy Rule 23(b)(3)'s ascertainability and predominance requirements.[12]  We denied Conner's

---

[9] *Id.* at *1.

[10] *Id.*

[11] *Steven A. Conner DPM, P.C. v. Fox Rehab. Servs., P.C. (Conner I)*, No. 2:21-cv-1580, 2022 WL 4080761, at *1 (E.D. Pa. Sept. 6, 2023) (quoting Mot. for Class Certification at 2–3).

[12] *Id.* at *4–6.

request for an interlocutory appeal.[13]

Shortly after Conner filed his class certification motion, Fox filed a summary judgment motion. Fox invoked our "reasonable recipient" standard and the constitutional-avoidance canon and argued that its faxes were not "advertisements." Fox also argued that if the statutory definition of "unsolicited advertisement" covered Fox's faxes, then § 227(b)(1)(C) would be facially overbroad, in violation of the First Amendment. Fox further claimed that § 227(b)(1)(C) imposed an unconstitutional content-based restriction on speech that failed to pass strict scrutiny (or, alternatively, intermediate scrutiny). The District Court denied Fox's motion because of genuine disputes of material fact as to whether the faxes were "advertisements."[14] The court also deferred ruling on Fox's First Amendment defense and explicitly told Fox that "[i]f this case goes to trial, you're going to have to present some evidence about it at trial."[15]

The District Court subsequently presided over a three-day bench trial and allowed the two parties to submit post-trial briefs. In its brief, Fox again invoked the constitutional-avoidance canon and our reasonable-recipient standard and argued that its faxes were not advertisements. Fox also renewed its overbreadth argument but referred to strict scrutiny and intermediate scrutiny only in passing. Fox never argued that the United States had failed to meet its burden of proving that § 227(b)(1)(C) passed First Amendment scrutiny. Fox could not have done so, considering that it had failed to timely

---

[13] *See* Order (Doc. 15), *Steven A. Conner DPM, P.C. v. Fox Rehab. Servs., P.C.*, No. 22-8048 (3d Cir. Dec. 5, 2022).

[14] *Conner I*, 2022 WL 4080761, at *8.

[15] APP00064 (Status Conference Hr'g Tr. at 34:8–11 (Aug. 22, 2022)).

5

notify the U.S. Attorney General about its constitutional challenge,[16] depriving the United States of an opportunity to present evidence and arguments defending the statute's constitutionality before the District Court.[17]

The District Court found that the eight faxes Fox sent Conner were "unsolicited advertisements."[18] The court also concluded that § 227(b)(1)(C) is not overbroad and rejected Fox's constitutional defense.[19] The court later entered final judgment against Fox on Conner's TCPA claims.

---

[16] Federal law requires that a party who raises a constitutional challenge to a federal statute in a private civil action "must promptly" provide notice to the U.S. Attorney General before the district court. Fed. R. Civ. P. 5.1(a). Fox never did. Federal law also requires that a court "certify such fact to the Attorney General, and shall permit the United States to intervene for the presentation of evidence, if [the] evidence is otherwise admissible in the case, and for argument on the question of constitutionality." 28 U.S.C. § 2403(a). This was never done either, at least not until we did so on Fox's cross-appeal. Although this does not mean Fox forfeited its opportunity to raise its constitutional defense, *see* Fed. R. Civ. P. 5.1(d), it does mean Fox has failed to preserve any arguments not raised before the District Court, including those raised for the first time on appeal in response to the United States' intervenor brief, *see Brown v. Philip Morris Inc.*, 250 F.3d 789, 799 (3d Cir. 2001).

[17] We have discretion over how to address the failure to provide proper notice to the Attorney General of a constitutional challenge to a federal statute, which failure had prevented the United States from presenting evidence and arguing before the District Court. *See Oklahoma ex rel. Edmonson v. Pope*, 516 F.3d 1214, 1216 (10th Cir. 2008). Given that Fox knowingly declined to provide the Attorney General timely notice in the District Court because Fox did not believe it was necessary, we find that Fox has failed to preserve any argument about the adequacy of the record vis-à-vis its First Amendment defense, as this argument was raised for the first time on appeal and not in its opening brief. *See Brown*, 250 F.3d at 799. We conclude that the record is sufficient to uphold § 227(b)(1)(C) as constitutional, as Fox has not identified any record evidence creating a genuine issue of material fact that would require us to remand, and prevent us from reaching the merits of the First Amendment issue. Therefore, in the interest of judicial economy, we decline to remand the matter to the District Court.

[18] *Conner II*, 2023 WL 2226781, at *6–8.

[19] *Id.* at *8 (citing *Robert W. Mauthe, M.D., P.C. v. MCMC LLC*, 387 F. Supp. 3d 551 (E.D. Pa. 2019)).

6

## III.[20]

We first address Fox's cross-appeal, starting with its claim that the District Court misapplied the standard for determining if a fax qualifies as an "advertisement" under the TCPA.[21]  We then consider Fox's facial and as-applied constitutional challenges.[22]

On appeal from a civil bench trial, we review factual findings for clear error and legal questions de novo.[23]  We review constitutional and statutory issues de novo.[24]  Our review is based on the "full record developed in court" at trial.[25]

### A.

The TCPA makes it "unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States . . . to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile

---

[20] The District Court had jurisdiction under 28 U.S.C. § 1331, and we have jurisdiction under 28 U.S.C. § 1291.

[21] Fox does not argue the District Court erred in finding that the faxes Conner received were "unsolicited" (*i.e.*, that Conner had never provided prior express consent to receive faxes from Fox).  Instead, Fox contends the error lies in the determination that the faxes were "advertisements."

[22] Fox does not specify whether it is raising a facial or as-applied challenge under the First Amendment, and therefore "we will address both."  *See United States v. Mitchell*, 652 F.3d 387, 405 (3d Cir. 2011).

[23] *McCutcheon v. Am.'s Servicing Co.*, 560 F.3d 143, 147 (3d Cir. 2009).

[24] *United States v. Norwood*, 49 F.4th 189, 200 (3d Cir. 2022).

[25] *See Ortiz v. Jordan*, 562 U.S. 180, 184 (2011).  We need not consider Fox's appeal from the denial of its summary judgment motion, because "an order denying summary judgment on sufficiency-of-the-evidence grounds is not appealable after trial." *Dupree v. Younger*, 598 U.S. 729, 731 (2023).  To the extent Fox claims we must address its First Amendment challenge based on the record presented at summary judgment, we disagree—the District Court did not resolve the First Amendment issue at summary judgment and instead deferred ruling on the issue pending development of a sufficient factual record at trial.

7

machine, an unsolicited advertisement."[26]  The TCPA defines "unsolicited

advertisement" as "any material advertising the commercial availability or quality of any

property, goods, or services which is transmitted to any person without that person's prior

express invitation or permission, in writing or otherwise."[27]  A fax is an advertisement if

it reveals "a nexus between the sending of the fax and the sender's product or services

and the buyer's decision to purchase the product or services."[28]

We apply an objective test to determine whether a fax is an "unsolicited

advertisement."[29]  The factfinder must decide whether, based on the content of "[t]he fax

itself," a "reasonable recipient could construe [the] fax as an unsolicited advertisement

for goods, services, or property."[30]  The answer "does not depend on the subjective

viewpoints of either the fax sender or recipient," which are legally irrelevant.[31]

In finding that Fox's faxes were advertisements, the District Court correctly

"consider[ed] only that material contained within the four-corners of the fax."[32]  The

court reviewed all eight faxes individually and concluded that "it is clear that all eight

faxes are promoting Fox's services in a way that suggests . . . Fox is trying to secure

---

[26] 47 U.S.C. § 227(b)(1)(C).

[27] *Id.* § 227(a)(5).

[28] *See Robert W. Mauthe, M.D., P.C. v. Optum Inc.*, 925 F.3d 129, 134 (3d Cir. 2019).

[29] *Robert W. Mauthe MD PC v. Millennium Health LLC*, 58 F.4th 93, 96 (3d Cir. 2023) (per curiam).

[30] *Id.* at 94; *id.* at 103 (Phipps, J., concurring) (noting that our precedents "ha[ve] tethered the meaning of 'unsolicited advertisement' to the text of the fax itself" (first citing *Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 562–63 (3d Cir. 2020); then citing *Optum*, 925 F.3d at 132–33)).

[31] *Id.* at 96 (majority opinion); *id.* at 96 n.2.

[32] *Conner II*, 2023 WL 2226781, at *5–8 (citing *Millennium*, 58 F.4th 93).

referrals from providers."[33]  The faxes, on their face, "tout a specific 'model' of care used by Fox which Fox describes as high quality and unique."[34]  The detailed descriptions of Fox's trademarked therapy model were promotional because they focused on Fox's "model, as opposed to any non-specific category of treatment services that can be offered by any variety of clinical providers like Fox."[35]  The faxes also contained "an embedded profit motive to gain referrals from past providers, because the more referrals Fox receives the more revenue they are hoping to receive from the patients' insurance."[36]  The District Court also properly rejected Fox's argument that its faxes were merely informational notices and not commercial advertisements.[37]  We find no clear error in the court's factual findings.[38]

Citing our use of the term "reasonable recipient" in *Robert W. Mauthe MD PC v. Millennium Health LLC*,[39] Fox argues the District Court should have looked beyond the four corners of the faxes.  We disagree.  *Millennium* reiterated that "an objective standard governs whether a fax constitutes an unsolicited advertisement."[40]  Although we framed the objective standard in terms of whether a "reasonable recipient could construe the . . .

---

[33] *Id.* at *6.
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] *Id.* at *6–7.
[38] *See Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").
[39] 58 F.4th 93 (3d Cir. 2023).
[40] *Millennium*, 58 F.4th at 96.

9

fax as an unsolicited advertisement for goods, services, or property,"[41] we considered only "[t]he fax itself," without any outside context,[42] in concluding that the free educational seminar faxes were not unsolicited advertisements.[43]  *Millenium* supports, not counters, the District Court's conclusions.  Therefore, having determined that the faxes were advertisements, we will turn to the question of whether Fox's First Amendment defense is a valid one.

## B.

Fox's constitutional challenges raise the threshold question whether strict scrutiny or intermediate scrutiny applies to § 227(b)(1)(C).  The United States and Conner argue that intermediate scrutiny applies.  Fox maintains that strict scrutiny applies.

In *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,[44] the Supreme Court made clear that "[t]he First Amendment, as applied to the States through the Fourteenth Amendment, protects commercial speech from

---

[41] *Id.* at 94.

[42] In *Millennium*, we looked beyond the four corners of the fax and considered "the contents of the free seminar" only to address the "pretext theory" espoused by the Federal Communications Commission (FCC).  *See id.* at 96–97.  However, unlike in *Millennium*, the pretext theory is not at issue here.

[43] *Id.* at 96.  Fox argues the *Millennium* Court could not have deduced that the seminar was free without looking beyond the four corners of the fax.  We disagree:  We were able to ascertain that the seminar was free based on the content of "[t]he fax itself," which contained no indicia that the seminar was anything other than free.  *Millennium*, 58 F.4th at 96.  "The fax itself ma[de] no mention whatsoever of goods, services, or property," lacked any "discussion of anything that can be bought or sold," included no "testimonials, product images, or coupons," and provided no "email, phone number, or direct internet link to purchase a Millennium Health product or service."  *Id.*  The same cannot be said of Fox's unsolicited faxes.  *See Conner II*, 2023 WL 2226781, at *6–8.

[44] 447 U.S. 557 (1980).

unwarranted governmental regulation,"[45] with the caveat that commercial speech is not

entitled to the same level of constitutional protection as noncommercial speech.[46] Since

then, the *Central Hudson* test—a form of intermediate scrutiny—has applied to content-

based restrictions on commercial speech.[47] The Supreme Court and our Court have

consistently and repeatedly reaffirmed the commercial-speech doctrine.[48]

      This is not to say that strict scrutiny may never apply when commercial speech is

implicated. While *Central Hudson* applies to circumstances where commercial speech is

restricted more heavily than noncommercial speech, or where a regulation distinguishes

between different types of commercial speech[49] (despite being a content-based

distinction),[50] strict scrutiny applies when commercial speech is *favored* over

---

[45] *Cent. Hudson*, 447 U.S. at 561 (citing *Va. Pharm. Bd. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 761–62 (1976)).

[46] *Id.* at 562 ("The Constitution . . . accords a lesser protection to commercial speech than to other constitutionally guaranteed expression." (citing *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456–57 (1978))).

[47] *See Greater Phila. Chamber of Com. v. City of Phila.*, 949 F.3d 116, 137–38 (3d Cir. 2020).

[48] *See*, *e.g.*, *id.* (holding "that intermediate scrutiny under *Central Hudson* is the appropriate level of review" because the ordinance "regulates commercial speech," and rejecting claim that strict scrutiny applied); *see also Sorrell v. IMS Health Inc.*, 564 U.S. 552, 579 (2011) (acknowledging that "the government's legitimate interest in protecting consumers from 'commercial harms' explains 'why commercial speech can be subject to greater governmental regulation than noncommercial speech'" (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 426 (1993))). Most recently, the Supreme Court stated (in dictum) that a regulation on "only commercial speech" is "subject to intermediate scrutiny," regardless of whether the regulation is "content based." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 73 (2022) (citing *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 507–12 (1981) (plurality opinion)).

[49] *See Cent. Hudson*, 447 U.S. at 564–65 & n.6; *Greater Phila.*, 949 F.3d at 137–40.

[50] *See Discovery Network*, 507 U.S. at 429; *see also Camp Hill Borough Republican Ass'n v. Borough of Camp Hill*, 101 F.4th 266, 269–70 (3d Cir. 2024) (recognizing that an ordinance imposes a content-based restriction if "[i]t distinguishes commercial from

noncommercial speech,[51] or where the distinction implicates viewpoint discrimination.[52]

Fox concedes that § 227(b)(1)(C) does not apply to noncommercial speech, and we agree. Commercial speech is "speech that *proposes* a commercial transaction,"[53] or an "expression related solely to the economic interests of the speaker and its audience."[54] We ask three questions when classifying speech as commercial: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech[?]"[55] If the answer to each question is yes, this "provides 'strong support' for the conclusion that the speech is commercial."[56]

The TCPA's definition of "unsolicited advertisement" is limited to "advertising"

noncommercial speech").

[51] *See Barr v. Am. Ass'n of Pol. Consultants, Inc. (AAPC)*, 591 U.S. 610, 619 (2020) (plurality opinion) ("Because the law favors speech made for collecting government debt over political and other speech, the law is a content-based restriction on speech."); *id.* at 621 ("Under the Court's precedents, a 'law that is content based' is "subject to strict scrutiny." (quoting *Reed v. Town of Gilbert*, 576 U.S. 155, 165 (2015))); *id.* at 650 (Gorsuch, J., concurring in judgment in part and dissenting in part) ("The statute is content-based because it allows speech on a subject the government favors (collecting its debts) while banning speech on other disfavored subjects (including political matters). The statute fails strict scrutiny because the government offers no compelling justification for its prohibition against the plaintiffs' political speech." (citation omitted)); *see also Camp Hill*, 101 F.4th at 269–70 ("Historically, the government has had more leeway to regulate commercial speech than other kinds of speech. Yet this ordinance disfavors *noncommercial* speech, which has never enjoyed less protection. So the Borough cannot rely on the commercial-speech doctrine, and the [ordinance's noncommercial speech] category faces strict scrutiny." (emphasis in original)).

[52] *See Greater Phila.*, 949 F.3d at 139.

[53] *Bd. of Tr. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482 (1989) (emphasis in original) (citing *Va. Pharm. Bd.*, 425 U.S. at 761).

[54] *See Greater Phila.*, 949 F.3d at 137 (quoting *Cent. Hudson*, 447 U.S. at 561).

[55] *Id.* (alteration in original) (quoting *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990)).

[56] *Id.* (quoting *U.S. Healthcare*, 898 F.2d at 933).

that is "commercial" in nature.[57] "Advertising is the action of drawing the public's attention to something to promote its sale. So to be an ad, the fax must promote goods or services to be bought or sold, and it should have profit as an aim."[58] Thus, by its plain terms, the definition comprises all three characteristics of commercial speech.[59] We therefore hold that *Central Hudson* controls because § 227(b)(1)(C) is expressly limited to commercial speech.[60]

We reject Fox's argument that the Supreme Court has essentially abandoned the commercial-speech doctrine and replaced it with a blanket rule that strict scrutiny applies to all content-based restrictions on speech. Fox's citations to *Sorrell v. IMS Health Inc.*,[61] *Reed v. Town of Gilbert*,[62] and *Barr v. American Association of Political Consultants, Inc. (AAPC)*,[63] do not persuade us otherwise. *Sorrell* is inapposite because it concerned a viewpoint-based restriction that merited "heightened scrutiny," and even so, its reference

---

[57] 47 U.S.C. § 227(a)(5).

[58] *Optum*, 925 F.3d at 133 (alteration omitted) (other omissions in original) (quoting *Mauthe v. Nat'l Imaging Assocs., Inc.*, 767 F. App'x. 246, 248–49 (3d Cir. 2019)).

[59] *See Greater Phila.*, 949 F.3d at 137.

[60] Fox argues that the constitutional-avoidance canon requires that we construe the term "unsolicited advertisement" to exclude its faxes. This argument is misplaced, especially considering Fox does not claim the statutory definition is ambiguous. *See United States v. Oakland Cannabis Buyers' Coop.*, 532 U.S. 483, 494 (2001) ("[T]he canon of constitutional avoidance has no application in the absence of statutory ambiguity."). Because our textual analysis concludes that the TCPA's unambiguous definition of "unsolicited advertisement" comports with First Amendment principles, we "have no occasion to consider application of the constitutional-avoidance canon." *See Carlton & Harris Chiropractic, Inc. v. PDR Network, LLC*, 80 F.4th 466, 475 n.4 (4th Cir. 2023) (declining to apply the constitutional-avoidance canon to the TCPA's definition of "unsolicited advertisement").

[61] 564 U.S. 552 (2011).

[62] 576 U.S. 155 (2015).

[63] 591 U.S. 610 (2020) (plurality opinion).

13

to "heightened scrutiny" likely referred to the *Central Hudson* test that the *Sorrell* Court applied—not necessarily to strict scrutiny.[64]  The plurality decision in *AAPC* did not alter this conclusion, as it concerned regulations that disfavored non-commercial speech.[65]  *Reed* similarly has little relevance, as the statute at issue there regulated exclusively noncommercial speech and therefore did not implicate the commercial-speech doctrine.[66]  Because none of those decisions abrogated *Central Hudson*, we are bound to apply the commercial-speech doctrine.[67]

## C.

Now that we have resolved the threshold question and concluded that intermediate scrutiny governs § 227(b)(1)(C), we must determine whether the statute is invalid on its face or as applied to Fox's faxes.  We begin with Fox's facial challenge.  We need not

---

[64] *See Greater Phila.*, 949 F.3d at 139 (stating that "*Sorrell* merely stands for the proposition that some level of scrutiny above rational basis review applied"); *see also Sorrell*, 564 U.S. at 571–72 (applying *Central Hudson* test); *Vugo, Inc. v. City of New York*, 931 F.3d 42, 49 (2d Cir. 2019) ("We hold that [after *Sorrell*] the *Central Hudson* test still applies to commercial speech restrictions.").

[65] *See Recht v. Morrisey*, 32 F.4th 398, 409–10 (4th Cir. 2022).  Fox's citation to *International Outdoor, Inc. v. City of Troy*, 974 F.3d 690 (6th Cir. 2020), is unpersuasive, because, unlike § 227(b)(1)(C), the speech restriction in that case "regulate[d] both commercial *and* non-commercial speech."  974 F.3d at 705 (emphasis added).

[66] *See Recht*, 32 F.4th at 409 ("Rather than overruling long-settled precedent, *Reed* simply concerned a totally different context; it cannot be distorted to so unsettle the *Central Hudson* regime."); *Contest Promotions, LLC v. City & Cnty. of San Francisco*, 874 F.3d 597, 601 (9th Cir. 2017) ("reject[ing] the notion that *Reed* altered *Central Hudson*'s longstanding intermediate scrutiny framework," and concluding that "[r]estrictions on commercial speech are subject to intermediate scrutiny under *Central Hudson*").

[67] *See Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality.").

address Fox's overbreadth challenge.[68]

**1.**

A commercial-speech regulation survives intermediate scrutiny if it satisfies all four *Central Hudson* prongs:

> First, speech that is misleading or concerns illegal activity is unprotected. But if the speech is lawful and not misleading, the restriction must satisfy three more prongs to survive. Second, the government must have a substantial interest in regulating the speech. Third, the restriction must directly advance that interest. Fourth, the restriction must be no broader than necessary.[69]

The government bears the burden of showing that the commercial-speech regulation meets all four prongs.[70] Accordingly, we must ask whether the government has shown that § 227(b)(1)(C) "directly advance[s]" a "substantial interest" without being "more than necessary to serve" that interest.[71]

It is notable that Fox has not identified a single case holding that § 227(b)(1)(C) violates the First Amendment. To our knowledge, except for one later-overturned decision,[72] every court that has addressed this question, including the Courts of Appeals

---

[68] We reject Fox's overbreadth challenge as incognizable because "the overbreadth doctrine does not apply to commercial speech." *Rad v. Att'y Gen. U.S.*, 983 F.3d 651, 662 (3d Cir. 2020) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982)).

[69] *Bank of Hope v. Miye Chon*, 938 F.3d 389, 395 (3d Cir. 2019) (citing *Cent. Hudson*, 447 U.S. at 566).

[70] *Zaunder v. Off. of Disciplinary Coun. of Sup. Ct. of Ohio*, 471 U.S. 626, 647 (1985).

[71] *Greater Phila.*, 949 F.3d at 140 (citing *Cent. Hudson*, 447 U.S. at 566); *see also Destination Ventures, Ltd. v. F.C.C.*, 46 F.3d 54, 55 (9th Cir. 1995) (applying *Central Hudson* test to § 227(b)(1)(C) and asking whether it "directly advance[s] a substantial government interest in a manner that forms a 'reasonable fit' with the interest" (quoting *Fox*, 492 U.S. at 480)).

[72] *See Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 196 F. Supp. 2d 920 (E.D. Mo.

15

for the Eighth and Ninth Circuits, have upheld § 227(b)(1)(C) as constitutional.[73]  In

doing so, they rejected arguments nearly identical to the ones Fox raises here.  We agree

and join them in holding that § 227(b)(1)(C) is constitutional.

**a.**

No one claims § 227(b)(1)(C) targets only unlawful activity or misleading

communications.  We begin, therefore, with the second *Central Hudson* prong

(substantial government interest).  The government may satisfy this prong by "showing

the significance of the harm it seeks to remedy" and "demonstrat[ing] the substantiality

of the interests with anecdotes, history, consensus, and simple common sense."[74]

The United States has identified substantial interests and has established them by

relying on the TCPA's legislative history, anecdotal evidence, common sense, and

unanimity among the courts that have addressed the issue.  First, the government has "a

___

2002), *rev'd*, 323 F.3d 649 (8th Cir. 2003).

[73] *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 652–60 (8th Cir. 2003); *Destination Ventures*, 46 F.3d at 55–56; *MCMC*, 387 F. Supp. 3d at 568–70; *McCall Law Firm, PLLC v. Crystal Queen, Inc.*, 335 F. Supp. 3d 1124, 1134–35 (E.D. Ark. 2018); *Physicians Healthsource, Inc. v. Stryker Sales Corp.*, 65 F. Supp. 3d 482, 497 (W.D. Mich. 2014); *Pasco v. Protus IP Sols., Inc.*, 826 F. Supp. 2d 825, 836–38 (D. Md. 2011); *Centerline Equip. Corp. v. Banner Pers. Serv., Inc.*, 545 F. Supp. 2d 768, 772–73 (N.D. Ill. 2008); *Acct. Outsourcing, LLC v. Verizon Wireless Pers. Commc'ns, L.P.*, 329 F. Supp. 2d 789, 813–17 (M.D. La. 2004); *Minnesota ex rel. Hatch v. Sunbelt Commc'ns & Mktg.*, 282 F. Supp. 2d 976, 981–84 (D. Minn. 2002); *Texas v. Am. Blastfax, Inc.*, 121 F. Supp. 2d 1085, 1091–92 (W.D. Tex. 2000); *Kenro Inc. v. Fax Daily, Inc.*, 962 F. Supp. 1162, 1167–69 (S.D. Ind. 1997); *Harjoe v. Herz Fin.*, 108 S.W.3d 653, 654–55 (Mo. 2003) (en banc) (per curiam); *Rudgayzer & Gratt v. Enine, Inc.*, 779 N.Y.S. 2d 882 (N.Y. App. Term 2004); *Chair King, Inc. v. GTE Mobilnet of Hous., Inc.*, 135 S.W.3d 365, 386–88 (Tex. App. 2004), *rev'd on other grounds*, 184 S.W.3d 707 (Tex. 2006); *Kaufman v. ACS Sys., Inc.*, 2 Cal. Rptr. 3d 296, 312–323 (Cal. Ct. App. 2003).

[74] *Nixon*, 323 F.3d at 654.  "[E]mpircal studies" are not required.  *Id.*

substantial interest in restricting unsolicited fax advertisements in order to prevent the cost shifting and interference such unwanted advertising places on the recipient."[75] Unlike mailed or emailed advertisements, fax advertisements are largely funded by the recipients, "who are forced to contribute ink, paper, wear on their fax machines as well as personnel time."[76] Such "costs are borne by the recipient of the fax advertisement regardless of . . . their interest in the product or service being advertised."[77] Additionally, "unsolicited fax advertising interferes with company switchboard operations and burdens the computer networks of those recipients who route incoming faxes into their electronic mail systems."[78] Congress focused on commercial fax advertisements specifically because they "constitute the bulk of all . . . unsolicited faxes," and "[t]here is no reason to doubt that Congress . . . believed . . . that noncommercial faxes did not present the same problem as commercial faxes and therefore distinguished between them."[79]

Second, as the Supreme Court has already recognized, the government has a substantial interest in protecting consumers' privacy interests against unsolicited advertising.[80] In enacting § 227(b)(1)(C), "Congress took aim at the *intrusive* nature of unsolicited faxes. Much the same way a telemarketing call invades one's right to be left alone, an unsolicited fax intrudes upon the right to be free from nuisance."[81]

---

[75] *Nixon*, 323 F.3d at 655.

[76] *Id.* at 652.

[77] H.R. Rep. No. 102-317, at 25 (1991).

[78] *Nixon*, 323 F.3d at 655.

[79] *See id.* at 655–58. For detailed discussions of this substantial government interest, *see id.* at 654–55; *Kaufman*, 110 Cal. App. 4th at 890–94, 906–14.

[80] *See Edenfield v. Fane*, 507 U.S. 761, 769 (1993).

[81] *MCMC*, 387 F. Supp. 3d at 569 (emphasis in original) (quoting *Melrose Hotel Co. v.*

17

For these reasons, we join the judicial consensus in concluding that the government's interests are substantial.

**b.**

The third *Central Hudson* prong requires the government to "demonstrate that the challenged regulation 'advances the Government's interest in a direct and material way.'"[82] Fox argues § 227(b)(1)(C) does not "materially advance" the government's interest because it "bans only faxes that promote goods or services for sale, excepting all other forms of unsolicited faxes to consume paper, ink, phone line capacity and so on."[83] For instance, Fox points out that the TCPA does not restrict the sending of unsolicited noncommercial faxes containing "repulsive but non-advertising content."[84]

Courts have rejected such arguments because Congress reasonably distinguished between commercial and noncommercial faxes when it chose to restrict only the most obtrusive faxes—commercial advertisements.[85] Congress determined that commercial advertisements comprised a significant tranche of all unsolicited faxes and believed "that noncommercial faxes did not present the same problem as commercial faxes."[86] Its decision to forgo restricting noncommercial faxes does not mean § 227(b)(1)(C) is

---

*St. Paul Fire & Marine Ins. Co.*, 432 F. Supp. 2d 488, 500–01 (E.D. Pa. 2006)); *see also id.* at 561–62 ("More broadly, the TCPA aims to mitigate 'the nuisance and invasion of privacy' that unsolicited telecommunications cause." (quoting *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 326 (3d Cir. 2015))).

[82] *Fla. Bar v. Went For It, Inc.*, 515 U.S. 618, 625–26 (1995) (quoting *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995)).

[83] Appellee/Cross-Appellant's Principal & Resp. Br. at 65.

[84] Appellee/Cross-Appellant's Reply Br. at 25.

[85] *See, e.g.*, *Nixon*, 323 F.3d at 655–58.

[86] *See id.* at 656.

invalid:  "The First Amendment does not require Congress to forgo addressing the problem at all unless it completely eliminates cost shifting."[87]  We conclude that, in the unsolicited fax context, the TCPA directly and materially advances the government's substantial interests "[b]y placing restrictions on those responsible for a large portion of the problem."[88]

### c.

The final *Central Hudson* prong asks whether the commercial-speech "restriction is not more extensive than necessary to serve the interests that support it."[89]  A narrowly tailored restriction "focuses on the source of the evils the [government] seeks to eliminate . . . and eliminates them without at the same time banning or significantly restricting a

---

[87] *Destination Ventures*, 46 F.3d at 56; *Nixon*, 323 F.3d at 658 ("Congress is not required to 'make progress on every front before it can make progress on any front.'" (quoting *United States v. Edge Broad. Co.*, 509 U.S. 418, 432–34 (1993))).

[88] *Nixon*, 323 F.3d at 658; *see also Destination Ventures*, 46 F.3d at 56 ("Because Congress's goal was to prevent the shifting of advertising costs, limiting its regulation to faxes containing advertising was justified.").  To the extent Fox suggests it is entitled to win by default on its First Amendment defense due to perceived inadequacies in the factual record as to the third *Central Hudson* prong, we disagree.  Although this prong requires that the government "demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree," *Edenfield*, 507 U.S. at 771, our "inquiry under this prong 'is not a license to reweigh the evidence *de novo*, or to replace [legislators'] factual predictions with our own," *Greater Phila.*, 949 F.3d at 142 (alteration in original) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994)).  Instead, our "task is merely to determine whether the legislature has 'drawn reasonable inferences based on substantial evidence.'"  *Id.* (omissions in original) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997)).  Moreover, Fox has failed to adequately preserve this argument for our review because it was not raised in Fox's opening brief or before the District Court.  *See Brown*, 250 F.3d at 799.

[89] *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) (quoting *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 188 (1999)).

substantial quantity of speech that does not create the same evils."[90] The Supreme Court has "made clear that 'the least restrictive means' is not the standard; instead, the case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends, . . . a means narrowly tailored to achieve the desired objective.'"[91]

Fox argues that § 227(b)(1)(C) cannot satisfy the fourth *Central Hudson* prong and identifies alternative, less restrictive solutions, including a "'do not fax registry,' time of day restrictions, and/or limitations on the number of faxes someone can send,"[92] that Fox claims would achieve the government's interest in "reducing the costs of unsolicited faxes to fax recipients."[93] However, several courts have already considered—and rejected—similar arguments invoking the same alternatives.[94] Indeed, a restriction may still be narrowly tailored and pass intermediate scrutiny even if "there is some imaginable alternative that might be less burdensome on speech."[95] We therefore agree that these potential alternatives fail to establish that § 227(b)(1)(C) is an unreasonable fit for the government's substantial interests.

---

[90] *Ward v. Rock Against Racism*, 491 U.S. 781, 799 n.7 (1989).
[91] *Lorillard*, 533 U.S. at 556 (omission in original) (quoting *Fla. Bar*, 515 U.S. at 632).
[92] Appellee/Cross-Appellant's Reply Br. at 25.
[93] Appellee/Cross-Appellant's Principal & Resp. Br. at 66.
[94] *See*, *e.g.*, *Nixon*, 323 F.3d at 659; *see also Kenro*, 962 F. Supp. at 1168–69 (rejecting plaintiff's proposed alternatives, which included "creating and maintain a 'do not fax' list; regulating the hours of fax advertising; [and] limiting the number or frequency of transmissions," had "fail[ed] to establish that the legislation Congress did choose is improperly tailored for its targeted goal" (quoting *Destination Ventures, Ltd. v. F.C.C.*, 844 F. Supp. 632, 639 (D. Ore. 1994))); *McCall*, 335 F. Supp. 3d at 1135; *Pasco*, 826 F. Supp. 2d at 838; *Hatch*, 282 F. Supp. 2d at 983–84; *Am. Blast Fax*, 121 F. Supp. 2d at 1092 ("[T]hese possible alternatives do not show that the TCPA's ban on unsolicited fax advertisements is an unreasonable 'fit' for the interests directly advanced by the ban.").
[95] *See Ward*, 491 U.S. at 797; *Nixon*, 323 F.3d at 659.

We also conclude that § 227(b)(1)(C) is narrowly tailored on its face. Commercial advertisers like Fox are not completely prohibited from sending unsolicited faxes; rather, advertisers may send unsolicited faxes to recipients with whom they have a preexisting business relationship.[96] In addition, § 227(b)(1)(C) does not ban commercial advertisers from messaging consumers through other means, such as direct mail, telephone calls, or in-person solicitation: "Advertisers remain free to publicize their products through any legal means; they simply cannot do so through an unsolicited fax."[97] Nor does the TCPA prohibit commercial advertisers from sending fax advertisements with the recipient's "prior express invitation or permission."[98] Unlike the commercial-speech restrictions invalidated by the Supreme Court, § 227(b)(1)(C) does not operate as a "complete ban on the communication of truthful information [about a commercial product]."[99] The statute is "neither intended to protect the public from the content of the speech nor to implement policy unrelated to the delivery of the message itself."[100] Because § 227(b)(1)(C) is so narrowly drawn, we cannot say that it is "substantially excessive" so that it fails the final *Central Hudson* prong.[101]

For these reasons, we conclude that § 227(b)(1)(C) is narrowly tailored to achieve

---

[96] *See* 47 U.S.C. § 227(b)(1)(C)(i)–(iii).

[97] *Nixon*, 323 F.3d at 659.

[98] 47 U.S.C. § 227(a)(5); *see also Nixon*, 323 F.3d at 660 ("If an advertiser wishes to promote its business by fax, there are many ways for it to secure the consent of willing potential customers, just as in *Florida Bar* where there were 'many other ways for injured Floridians to learn about the availability of legal representation.'" (quoting 515 U.S. at 633)).

[99] *Nixon*, 323 F.3d at 660 (alteration in original) (quoting *Lorillard*, 533 U.S. at 562).

[100] *Id.* at 659–60.

[101] *See Fox*, 492 U.S. at 479.

21

the government's substantial interests in protecting consumers against unfair shifting of advertising costs and from unwanted interference with their fax machines, and in protecting them against invasions of privacy. Therefore, § 227(b)(1)(C) satisfies all four prongs of the *Central Hudson* test; Fox's facial challenge fails.

**2.**

We now address Fox's as-applied challenge. Fox must show that the application of § 227(b)(1)(C) to its faxes violates its First Amendment rights.[102] It argues strict scrutiny should apply because its faxes contained enough informational content to trigger "the constitutional protection afforded noncommercial speech."[103] We disagree.

The three characteristics of commercial speech are present in all eight of Fox's faxes. First, we agree with the District Court that Fox's faxes are "advertisements."[104] Second, the faxes refer to specific services offered by Fox and emphasizes its trademarked business model (*i.e.*, "FOX's Geriatric House Calls™"); we agree with the District Court that "it is clear all eight faxes are promoting Fox's services in a way that suggests . . . Fox is trying to secure referrals from providers," considering "[t]he faxes tout a specific 'model' of care used by Fox and which Fox describes as high quality and unique."[105] Third, we agree with the District Court that Fox's faxes contained "an

---

[102] *Mazo v. N.J. Sec'y of State*, 54 F.4th 124, 134 n.8 (3d Cir. 2022).
[103] *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 463 U.S. 60, 68 (1983) (quoting *Cent. Hudson*, 447 U.S. at 563 & n.5).
[104] *See Conner II*, 2023 WL 2226781, at *6–7.
[105] *Id.* at *6. We also note that Fox promoted the availability of its services by conspicuously emphasizing—in capital letters and in bold lettering—that certain conditions were not required to obtain Fox's services (*e.g.*, "**NO HOMEBOUND STATUS REQUIRED**," "**NO FACE-TO-FACE-REQUIRED**," "**NO**

22

embedded profit motive to gain referrals from past providers."[106]

Fox nonetheless maintains that strict scrutiny should apply because its faxes included information relating to the COVID-19 pandemic. However, the Supreme Court has specifically cautioned "that advertising which 'links a product to a current public debate' is not thereby entitled to the constitutional protection afforded noncommercial speech."[107] This includes informational materials that "contain discussions of important public issues," even public health issues.[108] Indeed, because "[a] company has the full panoply of protections available to its direct comments on public issues . . . there is no reason for providing similar constitutional protection when such statements are made in the context of commercial transactions."[109]

Fox included pandemic-related information into its faxes to promote its own rehabilitative services and soliciting referrals. Fox (a seller) used this information to promote its services, which, by definition, "proposes a commercial transaction" and thus constitutes commercial speech.[110] We conclude that Fox's faxes are not entitled to the

---

**HOSPITALIZATION REQUIRED**"). *See id.* at *9 (App. A). The same can be said of the bolded, capitalized message that Fox is a "**MEDICARE PART B PROVIDER**," as this notified recipients that they could refer their Medicare Part B-enrolled patients to Fox for treatment. *See id.* Indeed, as one Fox representative testified at trial, this language was "essentially telling the story of the type of care and the location setting where we provide it." APP01674 (Vol. 2 Trial Tr. at 144:6–12).

[106] *Conner II*, 2023 WL 2226781, at *6.

[107] *Bolger*, 463 U.S. at 68 (quoting *Cen. Hudson*, 447 U.S. at 563 & n.5).

[108] *Id.* at 67–68.

[109] *Id.* at 68.

[110] *See Facenda v. N.F.L. Films, Inc.*, 542 F.3d 1007, 1017 & n.6 (3d Cir. 2008); *id.* at 1017 (recognizing an "infomercial," which "focuses on one product, explaining both how it works and the source of its innovations, all in a positive tone," as commercial speech)

same level of constitutional protection as noncommercial speech.  Thus, Fox's as-applied First Amendment challenge fails.

## IV.

We now address Conner's appeal, beginning with his argument that the District Court erred in failing to compel the disclosure of the Salesforce and Raintree databases before rendering its decision on class certification.  As with all "orders regarding the scope and conduct of discovery,"[111] we review limits on precertification discovery for abuse of discretion,[112] which "occurs if the district court's decision 'rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact.'"[113]

Although a district court should defer its certification decision until the record is adequate,[114] it must balance the need to make a decision that is "careful and well-informed" with the requirement that its decision "must not be unjustifiably delayed."[115]  If the court provided the plaintiff fair and ample opportunity to take discovery and present evidence before denying class certification, we should defer to the court's decision to deny additional precertification discovery.[116]  This includes when, as here, the plaintiff had ten months to take precertification discovery and never requested the discovery sought—even after filing

---

[111] *Petrucelli v. Bohringer & Ratzinger, GMBH*, 46 F.3d 1298, 1310 (3d Cir. 1995).

[112] *In re Niaspan Antitrust Litig.*, 67 F.4th 118, 139 (3d Cir. 2023).

[113] *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 312 (3d Cir. 2008) (quoting *Newton v. Merrill Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 165 (3d Cir. 2001)).

[114] *See Richardson v. Bledsoe*, 829 F.3d 273, 288–89 (3d Cir. 2016).

[115] *See In re Citizens Bank, N.A.*, 15 F.4th 607, 618 n.9 (3d Cir. 2021) (citing Fed. R. Civ. P. 23(c)(1), advisory committee's note to 2003 amendment).

[116] *See Hydrogen Peroxide*, 552 F.3d at 310.

a motion to compel.[117]  We find no error in the District Court's decision to close precertification discovery without compelling the disclosure of the Salesforce database.[118]

**V.**

We next consider Conner's appeal of the denial of class certification under Rule 23(b)(3).  Our "review of class certification determinations is normally limited to whether the district court abused its discretion in denying the motion."[119]  Our review is confined to the evidence and arguments presented at the time of the class certification decision.[120]

Class certification is proper only when the "the four requirements of Rule 23(a) and the requirements of either Rule 23(b)(1), (2), or (3)" are satisfied, as well as the prerequisite that the class be ascertainable.[121]  "The district court has a good deal of discretion in determining whether or not to certify a class."[122]  "If a district court harbors uncertainty about whether the plaintiff has satisfied the requirements of Rule 23, class certification should be denied."[123]

---

[117] Conner never submitted a discovery request for the Salesforce database.  A court cannot err by failing to compel the disclosure of unrequested discovery.  *See Petrucelli*, 46 F.3d at 1311 (explaining that serving discovery is a "prerequisite" to compel it).

[118] We agree with Fox that Conner failed to preserve the issue whether the District Court should have compelled the production of records from the Raintree database.  Conner never mentioned Raintree to the District Court during the class certification stage, so we cannot fault the court for failing to consider it.  Nor can we consider issues raised for the first time on appeal.  *See Brown*, 250 F.3d at 799.

[119] *Lusardi v. Xerox Corp.*, 975 F.2d 964, 973 (3d Cir. 1992).

[120] *See id.* at 306.

[121] *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590, 592–94 (3d Cir. 2012).

[122] *Mazus v. Dep't of Transp.*, 629 F.2d 870, 876 (3d Cir. 1980).

[123] *Niaspan*, 67 F.4th at 130 (citing *Mielo v. Steak 'n Shake Operations, Inc.*, 897 F.3d 467, 483 (3d Cir. 2018)).

**A.**

To satisfy the ascertainability requirement, the plaintiff must "show that: (1) the class is 'defined with reference to objective criteria'; and (2) there is 'a reliable and administratively feasible mechanism for determining whether putative class members fall within the class definition.'"[124] We focus here only on the second prong—administrative feasibility—because Conner appeals the District Court's finding that his methodology for ascertaining class membership was neither administratively feasible nor reliable.

"Administrative feasibility means that identifying class members is a manageable process that does not require much, if any, individual factual inquiry."[125] It requires that the plaintiff's proposed class be "currently and readily ascertainable."[126] However, the plaintiff need not "identify all class members at class certification" but rather "need only show that 'class members *can* be identified'" later in the litigation.[127]

Precedent constrains us to conclude that the District Court erred because it misinterpreted Conner's proposed class definition. The court correctly observed that "[m]embership in [Conner's] putative class inextricably relies on Openfax's transmission logs," but it misread the definition as requiring proof that the faxes reflected in the logs "were successfully transmitted."[128] The class definition, by its plain terms, requires no

[124] *Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015) (quoting *Carrera v. Bayer Corp.*, 727 F.3d 300, 355 (3d Cir. 2013)).
[125] *Carrera*, 727 F.3d at 307–08 (quoting William B. Rubenstein & Alba Conte, Newberg on Class Actions § 3:3 (5th ed. 2011)).
[126] *Id.* at 306 (quoting *Marcus*, 687 F.3d at 593).
[127] *Byrd*, 784 F.3d at 163 (emphasis in original) (quoting *Carrera*, 727 F.3d at 308 n.2).
[128] *Conner I*, 2022 WL 4080761, at *5.

such proof. Rather, membership in the putative class turns on whether the individual's

fax number was "*sent* one or more facsimiles . . . *identified as 'successful' transmissions*

on the fax transmission detail reports from OpenFax."[129]  Whether the individual in fact

received the faxes is irrelevant, at least for purposes of ascertainability.

Because the class definition does not require proof that the faxes were in fact

transmitted successfully, the class is currently and readily ascertainable through a

reliable, administratively feasible mechanism—namely, by reviewing the Openfax

transmission logs and identifying which faxes were identified as successfully transmitted.

This method is reliable because Fox has failed to identify evidence suggesting that any

faxes were never *sent*.  In addition, to the extent the class definition requires confirmation

that the fax numbers in fact belong to actual "persons" or "business entities,"[130] Conner

has stated that they can be identified with "contact data [ ] Defendant produced, . . .

reverse lookup services with lists . . . [and] if necessary, subpoenas to phone

companies."[131]  Given the circumstances, Conner's showing is sufficient to meet the

administrative feasibility requirement.

**B.**

Moving onto predominance, Rule 23(b)(3) requires that "questions of law or fact

common to class members predominate over any questions affecting only individual

members."[132]  The plaintiff bears the burden to establish, by a preponderance of the

---

[129] *Id.* at *1 (emphasis added) (quoting Mot. for Class Certification at 2–3).
[130] *Id.* (quoting Mot. for Class Certification at 2–3).
[131] *Id.* at *5 (alterations and omissions in original).
[132] Fed. R. Civ. P. 23(b)(3).

evidence, that "the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues"[133] and that its "claims are capable of common proof at trial."[134] We require "'actual, not presumed, conformance' with the" predominance requirement.[135] "A party's assurance to the court that it intends or plans to meet the requirement[ ] is insufficient."[136]

A district court must consider "how specific issues will play out [at trial] in order to determine whether common or individual issues predominate in a given case,"[137] as "the 'nature of the evidence that will suffice to resolve a question determines whether the question is common or individual.'"[138] "If proof of the essential elements of the cause of action requires individual treatment, then class certification is unsuitable."[139] Predominance requires a pragmatic, qualitative analysis.[140] Thus, the District Court's decision commands our respect unless "the court exceeded the bounds of the rationally available choices given the facts and the applicable law in the case at hand."[141]

---

[133] *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016) (quoting 2 William B. Rubenstein, Newberg on Class Actions § 4:49 (5th ed. 2012)).

[134] *In re Lamictal Direct Purchaser Antitrust Litig.*, 957 F.3d 184, 191 (3d Cir. 2020).

[135] *Hydrogen Peroxide*, 552 F.3d at 322 (alteration omitted) (quoting *Newton*, 259 F.3d at 167).

[136] *Id.* at 318 (citing *Newton*, 259 F.3d at 191).

[137] *Id.* at 311 (quoting *In re New Motor Vehicles Can. Exp. Antitrust Litig.*, 552 F.3d 6, 20 (1st Cir. 2008)).

[138] *Id.* (quoting *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005)).

[139] *Newton*, 259 F.3d at 172.

[140] *See Carter v. City of Montgomery*, 108 F.4th 1334, 1341 (11th Cir. 2024) ("[T]he predominance inquiry 'requires a pragmatic assessment of the entire action and all the issues involved.'" (omissions in original) (quoting *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1274 (11th Cir. 2019))).

[141] *Shook v. Bd. of Cnty. Comm'rs*, 543 F.3d 597, 603 (10th Cir. 2008) (quoting *Big Sky Network Can., Ltd. v. Sichuan Provincial Gov't*, 533 F.3d 1183, 1186 (10th Cir. 2008)).

A core component of § 227(b)(1) is an "unsolicited advertisement," which requires proof of two facts: (1) the fax was "unsolicited," meaning "without th[e] person's prior express invitation or permission, in writing or otherwise"; and (2) the fax was an "advertisement."[142] For the purposes of this opinion, we treat "unsolicited" as an essential element of a § 227(b)(1)(C) claim because Conner has not explained why we should disregard the ordinary burden of proof.[143]

The District Court did not abuse its discretion in determining that individualized questions about consent (*i.e.*, the "unsolicited" element) precluded predominance.[144] It found that Conner's putative class would require thousands of mini trials on the

---

[142] *See* 47 U.S.C. § 227(a)(5), (b)(1)(C).

[143] Ordinarily, the "plaintiff bears the burden of proving her claims." *Evankavitch v. Green Tree Servicing, LLC*, 793 F.3d 355, 361 (3d Cir. 2015). Conner claims the defendant bears the burden of proving the fax recipient had provided prior express invitation or permission, but Conner does not address any of the factors relevant to determining whether a particular fact (or set of facts) constitutes an affirmative defense as opposed to a defense where the burden shifts to the defendant to negate an element of the plaintiff's claim. *See id.* (discussing the five relevant factors). We have recognized that prior express permission or invitation is a complete defense to a TCPA unsolicited fax claim and that the defendant bears some burden in establishing that defense, but we have never clarified whether it is an affirmative defense. *See Daubert v. NRA Grp., LLC*, 861 F.3d 382, 390 (3d Cir. 2017) (acknowledging that the defendant is "required to prove [prior express consent] at trial," but not clarifying whether prior express consent is an affirmative defense); *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 622–23 n.9 (3d Cir. 2020) (confirming that the defendant who "seek[s] to prove consent must carry the burden of proof," but not clarifying whether consent is an affirmative defense). While we do not foreclose the possibility that prior express permission or invitation is an affirmative defense, we decline to resolve that issue today because Conner's failure to address the relevant factors has failed to sufficiently preserve this issue for our review. *See Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 148 (3d Cir. 2017).

[144] *Conner I*, 2022 WL 4080761, at *6.

individualized issue of whether the faxes had been unsolicited.[145]  Citing the putative

class member declarations produced by Fox,[146] the District Court found that "to

determine the type of consent each individual class member did or did not provide [Fox],

assuming any was given at all, would require individualized review" to resolve this

essential element of a § 227(b)(1)(C) claim.[147]  These factual questions would include:

> (1)    Whether Fox sought permission to send these faxes;
>
> (2)    What, if anything, Fox informed each class member about these faxes;
>
> (3)    How each class member provided their consent;
>
> (4)    Whether the specific fax or faxes each class member received fit within the contours of any consent that member may have provided; and
>
> (5)    Whether a class member invited the faxes in some other way than through a request from Fox to receive them.[148]

Though the declarations do not identify the exact instance of consent, the District Court

found that the declarations showed that Fox obtained prior express consent through

highly individualized methods of communication, rendering it impossible to resolve the

unsolicited element in the aggregate.[149]  We must defer to the District Court's findings

---

[145] *Id.*

[146] Although Conner argues otherwise, Fox did not need to obtain consent from Conner's counsel before engaging in precertification communications with putative class members. *See* David F. Herr, Annotated Manual for Complex Litigation § 21.12 (4th ed.) ("Defendants and their counsel generally may communicate with potential class members in the ordinary course of business").

[147] *Conner I*, 2022 WL 4080761, at *6.

[148] *Id.* (cleaned up).

[149] *See id.*; *see also*, *e.g.*, *Bais Yaakov of Spring Valley v. ACT, Inc.*, 12 F.4th 81, 89, 92 (1st Cir. 2021) (finding "no abuse of discretion in the district court's finding that . . . to identify those [consenting] members the court would have to 'parse through each unique

"even if we might have come to different factual conclusions based on th[e] record, . . . unless we are convinced that the record cannot support those findings."[150] Conner has failed to convince us that the record cannot support the District Court's findings.[151] Thus, we will affirm the order denying class certification.

## VI. Conclusion

For the foregoing reasons, we will affirm the District Court's orders denying class certification and entering judgment against Fox on Conner's individual TCPA claims.

---

relationship' between every class member and [the defendant]").

[150] *Oberti by Oberti v. Bd. of Educ. of Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993).

[151] Conner, as the appellant, has the burden of proving the District Court abused its discretion. *See Titus v. Mercedes Benz of N. Am.*, 695 F.2d 746, 751 (3d Cir. 1982).

MATEY, *Circuit Judge*, dissenting.

Tradition endures, but technology does not. I disagree that the United States has shown "a substantial interest in restricting unsolicited fax advertisements," *Missouri ex rel. Nixon v. Am. Blast Fax, Inc.*, 323 F.3d 649, 655 (8th Cir. 2003), under the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227. The record on this point is simply too scant to wade into, much less resolve, a constitutional question of first impression.[1] The best the United States can muster is that "unsolicited advertisements sent to fax machines can tie up phone lines, clog or empty paper trays, and otherwise interfere with a recipient's ability to send or receive other communications." Intervenor Br. 10–11. Fox responds that "[t]echnological changes have rendered unwanted faxes and their cost practically obsolete" such that "the governmental interests when the TCPA was passed in 1991 can hardly justify the statute's speech restrictions today." Surreply Br. 23–24.

How are we to break this tie? The quaint concerns raised by the United States seem unrecognizable to the modern reader who will struggle to understand why toner, thermal paper, and telephone busy signals much matter in 2025. Concerns, moreover, that

---

[1] In part, perhaps, because the District Court was reluctant to engage with Fox's constitutional defense. The District Court directed Fox "not to brief [the constitutionality of the TCPA] any further" because it was not "going to decide an issue like that on summary judgment." App. 64. Nor did the District Court delve into Fox's constitutional defense in its bench trial decision, summarily rejecting the argument because it found "the well-reasoned opinion of" another district court judge to be "persuasive on this issue." App. 134. Conner did little to help, failing to introduce any applicable evidence and simply restating the rulings of other courts. And Fox failed to notify the Attorney General of its defense "drawing into question the constitutionality of a federal . . . statute." Fed. R. Civ. P. 5.1(a).

1

are unsupported by a scintilla of record evidence.[2] Rather, "[b]ecause of the unresolved factual questions, . . . [I] think it necessary to permit the parties to develop a more thorough factual record, and to allow the District Court to resolve any factual disputes remaining, before passing upon the constitutional validity of the challenged provisions." *Turner Broad. Sys., Inc. v. Fed. Commc'ns Comm'n*, 512 U.S. 622, 668 (1994).

It is hard to see how decades-old congressional statements about "tie[d] up fax machines," S. Rep. 102-177, at 20 (1991), and "the cost of the expensive paper used to print out" faxes, H.R. Rep. No. 102-317, at 25 (1991), would qualify as substantial interests today.[3] But I would leave that for the District Court to consider in the first instance on remand. For these reasons, I respectfully dissent.

---

[2] True, the United States's late defense of the TCPA and the resulting undeveloped record are partially attributable to Fox's failure to notify the Attorney General of its constitutional defense. But since the majority agrees that Fox's failure is not forfeiture, I see no reason to restrict Fox to arguments raised before the United States intervened. *See* Maj. Op. 6 nn.16–17.

[3] Nor am I convinced that past congressional statements prologue the United States's present interest. It has been more than two decades since the Supreme Court last looked to this sort of "legislative history" to discern a governmental interest in a First Amendment case. *See Thompson v. W. States Med. Center*, 535 U.S. 357, 373 (2002). Rather than rest on these few and far-away comments, I would remand to develop a robust contemporary record.